UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF EASTERN MASSACHUSETTS

| | |
|---|---|
| JOSEPH A. KINSELLA, As Administrator  ) <br> And Personal Representative Of The            ) <br> Estate of Katherine Kinsella, And              ) <br> JOSEPH A. KINSELLA, Individually And    ) <br> On Behalf Of All Distributees Of               ) <br> Katherine Kinsella, Deceased,                   ) <br>                 Plaintiffs,                          ) <br>    v.                                                              ) <br> WYMAN CHARTER CORP.,                       ) <br> MICHAEL P. WYMAN, JOSEPH SHORE, ) <br> CORD SHORE, CARYLYN SHORE,          ) <br> TOAD HALL CORP., IAN McCOLGIN,    ) <br> THE MOTOR VESSEL "SEA GENIE II,"   ) <br> Her Engines, Tackle And Appurtenances,  ) <br> *In Rem*, and The Sailing Vessel                ) <br> "GRANUAILE," Her Engines, Tackle And ) <br> Appurtenances, *In Rem*,                             ) <br>                 Defendants,                        ) <br>    v.                                                              ) <br> RORY VANDAMME and                           ) <br> MARTIN MAHON,                                    ) <br>                 Third-Party Defendants.     ) <br>                                  ) | CIVIL ACTION NO. 04-11615-NMG |

**THIRD-PARTY COMPLAINT**
**(WITH JURY DEMAND)**

1. Joseph Shore, a defendant, is a natural person at relevant times resident in Massachusetts. At all relevant times Joseph Shore was licensed by U.S. Coast Guard as a Vessel Master pursuant to License No. 1090912.

2. Cord Shore, a defendant, is a natural person at relevant times resident in Massachusetts. Cord Shore on the night of the events in question acted as the helmsman

- 1 -

- 2 -

and was one member of the crew of the motor vessel SEA GENIE II. Cord Shore, the son of Joseph Shore, at all relevant times was trained and skilled in navigation and specifically skilled and experienced in navigation and control of SEA GENIE II.

3. Third-party defendant Rory Vandamme is a natural person at relevant times resident in Hyannis, Massachusetts, and on information, as of September, 2004 resident primarily in the Republic of Ireland. Vandamme initially was a passenger and in addition acted as to the matters in dispute as described below.

4. Third-party defendant Martin Mahon is a natural person at relevant times resident in Hyannis, Massachusetts, and on information, as of September, 2004 resident primarily in the Republic of Ireland. Mahon initially was a passenger and in addition acted as to the matters in dispute as described below.

5. On the night of July 22-23, 2001, at about 9:15 p.m., SEA GENIE II departed from the dock in Hyannis, Massachusetts for a planned three-hour harbor excursion. SEA GENIE II's passengers were college students, many of whom were residents of the Republic of Ireland working in the United States for the summer during a break from college or university studies. The charter cruise plan that night was to leave the dock area in Hyannis, anchor for some time in the harbor, and allow passengers to listen to music, dance, and socialize while on board. A festive, harmless outing was the plan.

6. In the course of the cruise Vandamme and Mahon volunteered to protect passengers from a specific risk as described below. Each stood guard and gave warnings as to the danger created by a broken rail. The broken rail created a specific serious risk

because of the weather, wave, and other conditions prevailing in the harbor at and after the moment the rail was broken.

7. At about 9:45 p.m. SEA GENIE II reached a safe point to anchor in Hyannis harbor near the breakwater and east of an outcrop of land known as Kalmus Park. SEA GENIE II was diligently and carefully anchored by her crew so as to be fixed and at a safe distance from nearby anchored vessels. The SEA GENIE II anchor was for a time fixed, the anchor line was secured, and the vessel appeared to the crew to be securely at anchor.

8. At about 10:45 p.m. SEA GENIE II unexpectedly came in contact with a nearby anchored vessel, the sailing vessel GRANUAILE. The precise cause of that contact is not known.

9. As near as can be determined, one or more SEA GENIE II passengers as a misguided prank loosened the SEA GENIE II anchor line or raised the anchor or dislodged it without permission and without notifying the SEA GENIE II crew. That change in the status and rigging of the anchor possibly caused SEA GENIE II to unexpectedly and very briefly drift.

10. Drifting caused SEA GENIE II to make contact with GRANUAILE, causing damage to one section of the right (starboard) side of the vessel at the deck guard rail of SEA GENIE II. For a time the damaged rail section was hanging loose but still connected. In that area the rail in normal use reaches to a solid waist-high wall outboard of the walkway.

11. When SEA GENIE II discovered the rail section was damaged, Cord Shore immediately decided to terminate the charter cruise and to return SEA GENIE II to dock and to discharge all passengers.

12. When Cord Shore learned of the damage to the rail he promptly asked or ordered a SEA GENIE II crew member to rope off and secure the area. It is not known whether a crew member for a time did use or attempt to use rope or tape to mark or guard the area.

13. Vandamme after he saw that the rail was broken volunteered to try to fix it. Vandamme did not have any carpenter's tools, equipment for use in working with metal, nor any experience or training in the fixing of ships' equipment. Vandamme and another passenger, David O'Neil, stayed in the immediate walkway area to make sure that no one passed by and to warn persons in the area of the danger caused by the space where the rail was damaged. Vandamme stayed there a number of minutes as a guard. Vandamme then left his spot in the walkway and stopped warning passengers of the danger. Vandamme did so without telling Cord Shore or the other crew that he was leaving. Vandamme did not ask for or wait for anyone to take his place.

14. Starting at about 10:50 p.m., after the rail was discovered to have been broken, passenger Mahon stationed himself or was requested to stand at the cabin door on the right side of the vessel to warn passengers of the danger and to prevent passengers from going through the door to the open deck and from walking near the gap in the broken rail. Mahon while blocking the right-side cabin door was aware that another person, passenger Vandamme, was forward of the broken rail and was not letting people walk past the rail back in the direction of the cabin.

- 5 -

15. Mahon stayed in his position and guarded the right-side cabin door which allowed access to the area of the damaged rail for a number of minutes. Then, without telling Cord Shore or other crew, at a point in time not yet known, Mahon left that position. Mahon did not ask or wait for anyone to continue his guarding activity. Mahon left his position because, according to Mahon, he was annoyed by the other passengers who were shouting and "giving out" to him because Mahon was not letting them out the right-side cabin door to the area where the rail was broken.

16. At about 11:00 p.m. SEA GENIE II commenced to proceed slowly back to the navigation channel to begin the return to dock. Cord Shore believed the named persons or other persons were guarding the damaged rail area and that a crew member had roped it off or was about to do so.

17. At a point in time not exactly known, Ms. Kinsella went off or fell off the vessel. Vandamme after he left his position and while near the bow and not at the rail thought he saw the form of a person go overboard. Vandamme reported that. The person, not immediately identified as Ms. Kinsella, was reported or described as overboard after Mahon had left his position at the starboard cabin door.

18. A life-saving ring with strobe light was immediately thrown overboard once the report of a person possibly overboard was received. The vessel began a Williamson rescue turn to maneuver to recover the person overboard. Exactly how, when and where the person later identified as Ms. Kinsella entered the water is not known.

19. After the initial report by Vandamme that someone had perhaps fallen or gone overboard, a number of the passengers began to shout and there was considerable noise, confusion, and some panic.

20. Vandamme, fifteen minutes after he says he reported seeing Ms. Kinsella or a victim in the water, told Cord Shaw that he wasn't sure he had seen something and was not sure that anyone had gone overboard. Joseph Shore as a result ordered that a head count be taken to determine if in fact any passenger had fallen or gone overboard. No accurate head count could be taken because the passengers kept moving, contrary to instructions during the count. Cord Shore then ordered a "buddy" check of all different groups. That was able to be conducted. Only then was Ms. Kinsella identified as missing.

### THIRD-PARTY COMPLAINT—COUNT I (Negligence).

21. Joseph Shore and Cord Shore repeat and incorporate all prior allegations of this Third-Party Complaint.

22. By reason of the foregoing, third-party defendants Vandamme and Mahon, and other persons not yet identified who caused any change in the condition of SEA GENIE II or its anchor, are each liable to plaintiffs for negligence. Each is thereby liable for damages caused to plaintiffs or for liabilities incurred to plaintiffs or any party by either of the named Shore defendants, plus interest and other relief as appropriate.

### THIRD-PARTY COMPLAINT—COUNT II (Contribution).

23. Joseph Shore and Cord Shore repeat and incorporate all prior allegations of this Third-Party Complaint.

24. By reason of the foregoing, third-party defendants Vandamme and Mahon, and other persons not yet identified who caused any change in the condition of SEA GENIE II or its anchor, are each liable to plaintiffs. Each is thereby liable for actual

damages caused to plaintiffs and is liable in contribution for liabilities incurred by either of the named Shore defendants to plaintiffs or any party, plus interest and other relief as appropriate.

### THIRD-PARTY COMPLAINT—COUNT III (Indemnity).

25. Joseph Shore and Cord Shore repeat and incorporate all prior allegations of this Third-Party Complaint.

26. By reason of the foregoing, third-party defendants Vandamme and Mahon, plus other persons not yet identified who caused any change in the condition of SEA GENIE II or its anchor, are each liable to plaintiffs. Each is thereby liable for actual damages caused to plaintiffs and liable to indemnify the named Shore defendants for liabilities incurred by either of those defendants to plaintiffs or any party, plus interest and other relief as appropriate.

### THIRD-PARTY COMPLAINT—COUNT IV (Wrongful Death).

27. Joseph Shore and Cord Shore repeat and incorporate all prior allegations of this Third-Party Complaint.

28. By reason of the foregoing, third-party defendants Vandamme and Mahon, plus other persons not yet identified who caused any change in the condition of SEA GENIE II or its anchor, are each liable to plaintiffs for the wrongful death of Katherine Kinsella and are liable to the named Shore defendants for all or part of any liability of those defendants to plaintiffs. Each is thereby liable for actual damages caused to plaintiffs and for liabilities incurred by either of the named Shore defendants to any party, plus other relief as appropriate.

## JURY DEMAND

**DEFENDANTS HEREBY REQUEST A TRIAL BY JURY ON ALL ISSUES AND CLAIMS SO TRIABLE.**

Defendants,
JOSEPH SHORE, et al.
By their attorneys,

/s/ Paul G. Boylan
Paul G. Boylan, BBO No. 052320
Kevin G. Kenneally, BBO No. 550050
DONOVAN HATEM LLP
Two Seaport Lane
Boston, MA 02210
617-406-4513

Dated: Oct. 13, 2004

### Certificate of Service

The undersigned counsel for defendants Shore, *et al.* today gave notice of the foregoing **Third-Party Complaint (With Jury Demand)** by first-class mail to counsel for plaintiffs Kinsella, *et al.*, Sarah B. Herlihy, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., One Financial Center, Boston, MA 02111, and co-counsel, Andrew V. Buchsbaum, Friedman & James LLP, 132 Nassau Street, New York, NY 10038; counsel for Wyman, Bertram E. Snyder, Looney & Grossman LLP, 101 Arch Street, Boston, MA 02110; counsel for Michael Wyman, Thomas E. Clinton, Clinton & Muczyka, P.C., One Washington Mall, Suite 1400, Boston, MA 02108; and defendant Ian McColgin, *pro se*, P.O. Box 1991, Hyannis, MA 02601.

Dated: October 13, 2004       /s/ Paul Boylan

24100.0//00867079.